UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
COURTNEY DAVID,

                            Plaintiff,

        vs.

The CITY OF NEW YORK, POLICE OFFICERS
JUAN CARRERO, Shield # 160,
YU NG, Shield # 11496,
NADIA MORANT, Shield # 950,
BRIAN KANG, Shield # 31389,
And JOHN DOES 1-3,
in their individual and official capacities,

                            Defendants.
-------------------------------------------------------x

**COMPLAINT**

**13 CV 3949 (PAC)**

**ECF Case**

**JURY TRIAL DEMANDED**

Plaintiff Courtney David, by her attorney, Cyrus Joubin, complaining of the Defendants,

respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.    This civil rights action arises from the arrest and prosecution of Courtney

David ("Plaintiff") on the false and fabricated grounds that she menaced another

individual with a bat.  Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983

("Section 1983") against the individual defendants for unreasonable search and seizure,

false arrest and imprisonment, malicious prosecution, excessive force, and failure to

intervene, and a *Monell* claim against the City of New York for the same constitutional

violations.  Additionally, Plaintiff asserts analogous claims under New York Law against

the individual defendants, and against the City of New York under the doctrine of

*respondeat superior.*  Plaintiff seeks compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

## JURISDICTION

2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth Amendment to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

## VENUE

4.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district and Plaintiff resides in this district.

## JURY DEMAND

5.     Plaintiff respectfully demands a trial by jury on each and every one of her claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.     Plaintiff Courtney David is an African-American female, a citizen of the United States, and at all relevant times a resident of the City of New York, State of New York.

7.     The individually named defendants Police Officer Juan Carrero, Shield # 160 ("PO Carrero"), Police Officer Yu Ng, Shield # 11496 ("PO Ng"), Police Officer Nadia Morant, Shield #950 ("PO Morant"), Police Officer Brian Kang, Shield # 31389 ("PO Kang"), and Police Officers John Does 1-3 (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

8.     Upon information and belief, on the date of the incident giving rise to this complaint, the individual defendants were assigned to the Police Service Area Six in Manhattan.

9.     Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

10.     Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## NOTICE OF CLAIM

11.     Plaintiff served a Notice of Claim on the Comptroller of the City of New York within ninety days of the incident.  At least 30 days have elapsed since the service of the Notice of Claim, and adjustment and payment has been neglected or refused.

12.     The City of New York demanded a hearing pursuant to General Municipal Law § 50-h, which hearing was held on April 2, 2013.

13.     This action has been commenced within one year and ninety days after the occurrence of the event upon which the claims are based.

## STATEMENT OF FACTS

14.     Plaintiff has lived at 2453 Adam Clayton Powell Jr. Boulevard, Apartment 3C (the "Apartment"), in New York, NY for over twenty years, sharing the Apartment with her father, Wentworth David ("Mr. David").

15.     Around April 2011, while Plaintiff was temporarily living elsewhere, Mr. David subleased a room in the Apartment to Charnay Murphy ("Ms. Murphy").

16.     Around August 2012, Plaintiff was living in the Apartment again, sharing it with Ms. Murphy.  Mr. David was no longer living in the Apartment.

17.     From August 2012 to December 2012, it was obvious to Plaintiff that Ms. Murphy, who is about sixty-years-old, frequently used crack cocaine in the Apartment.

18.     Ms. Murphy constantly exhibited strange, clouded, and irrational behavior; she was always hostile and aggressive, cursing and screaming for no reason, hitting and breaking objects out of baseless rage.

19.     On many occasions, Ms. Murphy threatened Plaintiff, saying that she would "kill" and "shoot" Plaintiff, and that Plaintiff would die and end up dead in a "bag."

20.     Ms. Murphy has a criminal history, and she has fraudulently used different aliases for herself.

21.     On December 8, 2012, Plaintiff went to the gym with her boyfriend, Shaun Sprague ("Mr. Sprague"), and they returned to the Apartment around 5:00 PM.

22.     When Plaintiff and Mr. Sprague walked into the Apartment, they heard frenzied shouting in Ms. Murphy's room, and they smelled a foul odor permeating the Apartment.

23.     The frenzied shouting was coming from Ms. Murphy, who was inside her room with the door closed.

24.     To the extent Ms. Murphy could be understood, she seemed to be yelling about Plaintiff, calling her a "bitch" and saying the "bitch is not gonna make me leave."

25.     Plaintiff went to her own bedroom, where she discovered a pile of human feces on the floor, causing the horrible odor; in addition, there was urine all over and around her sneakers.

26.     Plaintiff could still hear Ms. Murphy yelling from inside her room.  Now Ms. Murphy was wildly ranting about having a "gun" and shooting Plaintiff with the gun; she could also be heard smashing objects around the room, causing quite a commotion.

27.     Scared, Plaintiff called 911 and asked the NYPD for help, explaining the situation inside the Apartment.

28.     Around the same time, Ms. Murphy also called 911.

29.     Plaintiff and Mr. Sprague then left the Apartment to escape any danger.

30.     Plaintiff waited alone for the Police in the lobby of her Apartment building.

31.     After about ten minutes of waiting, Plaintiff called 911 again.  She was told that NYPD officers would arrive soon.

32.     Soon, two marked police cars pulled up to the Apartment building.  The individually named defendants emerged from the two cars and approached Plaintiff.

33.     PO Morant asked Plaintiff if she called the police, to which Plaintiff said yes.

34.     Plaintiff proceeded to explain to the individual defendants the situation with Ms. Murphy, including Ms. Murphy's recent threats to kill Plaintiff.

35.     Although Plaintiff was composed, lucid, and coherent and clearly posed no threat, PO Morant drew her pepper-spray menacingly at Plaintiff and asked Plaintiff accusatorily, "But what did you do?  What's your part in this mess?"

36.     Plaintiff has Graves' disease, an autoimmune disease that causes her eyes to protrude and bulge – and the individual defendants outrageously considered this physical symptom as a sign of culpability and suspicion, irrationally disbelieved what Plaintiff said simply because of her unusual appearance, and unreasonably discounted the truth of Plaintiff's perceptions simply because she looked different.

37.     After the conversation in the lobby, the individual defendants went to the Apartment and directed Plaintiff to follow them.

38.     Upon reaching the door to the Apartment, the individual defendants instructed Plaintiff to enter the Apartment, ordering her to walk into the Apartment first despite her expressed fears.

39.     Plaintiff walked into the Apartment first, apprehensive about the danger behind the door.

40.     Inside the Apartment, the corridor was empty, and Ms. Murphy's door, which was at the end of the corridor, remained closed, with Ms. Murphy still inside her room.

41.     The individual defendants walked to Ms. Murphy's door, which was locked, and announced that they were police.

42.     When Ms. Murphy opened the door, she continued yelling about Plaintiff, referring to her as a "fat bitch" who "think she gonna run this apartment," and saying "fuck dat fat bitch."

43.     The individual defendants tried calming Ms. Murphy down and eventually got her to stop yelling.

44.     The individual defendants separated Plaintiff and Ms. Murphy by taking Plaintiff to her bedroom, while some of the individual defendants continued to question Ms. Murphy in the corridor.

45.     The individual defendants all observed the excrement and urine in Ms. David's bedroom.

46.     The individual defendants all understood that Ms. Murphy defecated and urinated on Plaintiff's property because Ms. Murphy, while being questioned, acknowledged doing so.

47.     Such conduct by Ms. Murphy constitutes Criminal Mischief in the Fourth Degree under New York Penal Law 145.00.

48.     The individual defendants cracked jokes and laughed at the excrement in Plaintiff's bedroom, musing aloud about Ms. Murphy's motives in committing such an act.

49.     The individual defendants questioned Plaintiff in her bedroom for about five minutes.

50.     In answering the individual defendants' questions in the Apartment, Plaintiff told the individual defendants about Ms. Murphy's crack habit, and about the frequent death threats she receives from Ms. Murphy.

51.     Plaintiff was asked if she actually saw a gun in Ms. Murphy's possession, and she replied that she did not see any gun; she only heard Ms. Murphy's repeated threats about a gun.

52.     In answering the individual defendants' questions, Plaintiff was polite, cooperative, open, and honest; she comported herself in a dignified and coherent manner.

53.     At no point prior to her arrest did Plaintiff incriminate herself in anything unlawful.

54.     At no point prior to her arrest did Plaintiff do, say, or display anything illegal or suspicious.

55.    In answering the individual defendants' questions, Ms. Murphy glozed over her own wrongdoing – criminal mischief and making death threats – and made a blatantly and obviously false accusation against Plaintiff:  that Plaintiff attacked her with a baseball bat, swinging the bat at her and striking her.

56.    Plaintiff is articulate and expresses herself well.  Even in the tense and emotional situation, her ability to communicate did not abandon her; she was measured and restrained.  While she may have used more anacolutha than she usually does because of the stressful situation, her overall verbal poise and control over language – coupled with her lack of criminal history – convincingly demonstrated something about her character and morality:  she is not a violent person and would not resolve a dispute by attacking a person with a baseball bat.

57.    By contrast, Ms. Murphy expressed herself irrationally and incoherently because she was high on crack cocaine.

58.    When Ms. Murphy called the Police, she could not even spell her name correctly (she used an "f" in spelling her last name); she also used loud, crazed, and unmeasured language like "this bitch is gonna have to go down" along with other incomprehensible things.

59.    Ms. Murphy continued speaking in a loud, crazed, and unmeasured manner when she was speaking to the individual defendants.

60.    It should have been clear that Ms. Murphy was stoned and lying:  not only was the manner of her speech clouded and crazed, the substance of her words was implausible and incredible.

61.    Ms. Murphy's room was also a complete mess, with shards of crack cocaine on the floor.

62.     Rather than consider the plausibility of what Plaintiff and Ms. Murphy were saying, or their respective demeanors, the individual defendants considered only the shallowest and most superficial indicia of truth:  physical appearance.

63.     Simply because Ms. Murphy is older and looks "more normal" than Plaintiff, the individual defendants believed Ms. Murphy's version of events and disbelieved Plaintiff's version.

64.     Ms. Murphy had absolutely no injuries consistent with a baseball bat attack.

65.     The individual defendants searched the Apartment and found no baseball bat.

66.     While Plaintiff had no criminal history, Ms. Murphy did have a criminal record, including recent crimes of dishonesty and moral turpitude.

67.     Ms. Murphy also had a history of using false names; one of her aliases is "Shirley Walker."

68.     The individual defendants could have easily ascertained Ms. Murphy's criminal history and her use of fake names because such information is available in computerized databases which NYPD officers can readily access.

69.     The individual defendants never asked for Ms. Murphy's identification; never verified her identity; and never looked into her criminal history and her use of false names.

70.     While inside her bedroom, Plaintiff could hear some of the individual defendants questioning Ms. Murphy in the corridor.

71.     Specifically, Ms. Murphy was asked by the individual defendants why she defecated and urinated in Plaintiff's bedroom.

72.     Ms. Murphy said she defecated and urinated in Plaintiff's bedroom because she was angry at Plaintiff due to disputes over the Apartment.

73.    At another point while speaking to the individual defendants, Ms. Murphy said, "One of us won't survive to see next week."

74.    Upon hearing those words, Plaintiff indicated to the individual defendants that those words contained a veiled threat.  Hearing Plaintiff's statement, PO Morant interjected harshly, saying "No, that's not what I heard."

75.    After saying this, PO Morant whispered something to PO Carrero.

76.    Immediately afterwards, PO Carrero asked for Plaintiff's ID, which Plaintiff readily provided to him.

77.    PO Carrero then put her ID in his pocket, put on his black leather gloves, and handcuffed Plaintiff, placing her under arrest.

78.    PO Carrero apologized as he handcuffed Plaintiff behind her back.

79.    Plaintiff asked why she was under arrest, and the individual defendants explained it was because Ms. Murphy claimed that Plaintiff assaulted her in the Apartment with a baseball bat.

80.    After being handcuffed, Plaintiff was told by PO Ng that "bad things happen to people – you'll get over it."

81.    Plaintiff was placed in brass handcuffs for about twenty minutes, during which time the handcuffs cut and ripped into her skin, causing intense pain and leaving a permanent scar.

82.    Plaintiff complained that the "cuffs are too tight" but the individual defendants ignored her complaint.

83.    After being placed in handcuffs, Plaintiff was transported to a nearby precinct, where she was patted down, searched, and placed in a cell.

84.     Despite the cold and inclement weather, Plaintiff was not allowed to bring a coat from the Apartment; all she was wearing were her gym clothes, a spandex shirt and leggings.

85.     At the precinct, during the search, Plaintiff was told to lift her breasts and shake them, ostensibly to ensure there were no weapons hidden beneath them.

86.     While Plaintiff was sitting in the holding cell, she asked why she was arrested.

87.     In response, PO Carrero explained to her:  "I wouldn't tell you to lie, but there's a reason why they kept asking you, did you see the gun?  The reason you are here is because she said she saw you and you're saying you don't know what she was doing behind the door."  He added, "I'm not gonna tell you to lie, but you'll learn your lesson."

88.     Ms. Murphy was neither arrested nor charged for threatening Plaintiff and soiling her property, despite the illegal nature of such conduct.

89.     After some time in the precinct, Plaintiff was transported to Central Booking in lower Manhattan; PO Carrero and PO Ng drove her.

90.     When the NYPD vehicle arrived outside Central Booking, it was raining heavily.  Nevertheless, PO Carrero and PO Ng instructed Plaintiff to stand in the rain uncovered for several minutes, allowing her to get dangerously soaked in the very cold weather.

91.     At Central Booking, Plaintiff was taunted and humiliated, with one officer saying "Is that a man or a woman?  Where you taking that?"  At another point, an officer told her to remove her "wig," referring to her actual hair.

92.     Plaintiff was searched and frisked again before being put in a holding cell with other females.

93.     After several hours in the holding cell, Plaintiff was arraigned; her case was assigned Docket Number 2012NY092471.

94.     At Plaintiff's arraignment, the Manhattan District Attorney's Office (the "DA") filed a misdemeanor complaint (the "Complaint") with the Criminal Court.

95.     The Complaint charged Ms. David with one count of Menacing in the Second Degree, and one count of Criminal Possession of a Weapon in the Fourth Degree – Class A Misdemeanors.

96.     The factual substance of the Complaint was provided by PO Carrero, who swore to the truth of the Complaint.

97.     The Complaint alleged that Plaintiff "did possess a baseball bat and used it to menace" Ms. Murphy.

98.     At the request of the DA, the Criminal Court Judge issued a full order of protection against Plaintiff, ordering Plaintiff to stay away from Ms. Murphy, and prohibiting Plaintiff from going back to the Apartment.

99.     Plaintiff was released on her own recognizance and was ordered to return to Court on January 28, 2013.

100.    The prosecution against Plaintiff lasted until May 21, 2013, at which point the case was dismissed pursuant to Criminal Procedural Law 30.30 (Speedy trial).

101.    To fight the charges against her, Plaintiff was required to appear in Criminal Court seven times:  on January 28, February 15, March 19, April 22, May 2, May 14, and May 21, 2013.

102.    Throughout the prosecution, the order of protection remained in effect and thus prevented Plaintiff from going to the Apartment, thereby rendering Plaintiff homeless and forcing her to sleep in shelters and squalid conditions for over six months.

103.    As a result of not having a home, Plaintiff's life was turned upside-down, causing her great suffering and instability, putting her in great danger physically and mentally.

104.    As a result of not having a home, Plaintiff could not pursue her college education as she had planned.

105.    Having never been arrested before, Plaintiff suffered extreme emotional distress due to the experience of being caged like an animal, feeling thoroughly dehumanized.

106.    While Plaintiff was composed and restrained prior to her arrest, when she was caged in the precinct and at Central Booking, she could not stop crying because what she was going through was traumatic.

107.    As a result of her unlawful arrest and malicious prosecution, Plaintiff suffered humiliation and degradation, with emotional pain and suffering lasting throughout the prosecution.

108.    As a result of her false arrest and malicious prosecution, Plaintiff was traumatized and lost her self-esteem and self-worth.  Her animal-like treatment at the hands of NYPD officers made her feel devalued, worthless, like a piece of trash, and her mental state deteriorated because of it.

109.    Plaintiff became severely depressed and felt her life was destroyed as a result of the arrest and prosecution.  Her depression became so severe that she had suicidal ideation.  Her despair was so intense that it manifested itself physically, with muscle stiffness and swelling.

110.     Because of the heavy emotional toll, Plaintiff's Graves' Disease worsened during the period of her prosecution, and she was unable to seek adequate medical treatment during the period in which she was displaced from her home.

111.     As a result of being uprooted from her home, Plaintiff spent all her savings on things she ordinarily did not need – such as travel expenses.

112.     The NYPD failed to supervise and discipline the individual defendants despite their substantial histories of reckless, malicious, and mendacious behavior.

113.     Upon information and belief, serious complaints have been lodged against the individual defendants, illustrating larger patterns of misconduct.

114.     In response to such complaints, the NYPD failed to properly investigate, adjudicate, and impose discipline, ignoring the risk that the individual defendants would engage in future misconduct, thereby encouraging them to continue violating the civil rights of New Yorkers.

115.     By turning a blind eye to the repeated misconduct of the individual defendants, the Defendant City has demonstrated deliberate indifference to the rights of New Yorkers.

116.     The inadequacy of NYPD's supervision and discipline with respect to police misconduct is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals," which pressure officers to arrest people and file charges unlawfully, a pressure not tempered by adequate safeguards that ensure citizens are not being wrongfully arrested and charged.

117.     On October 17, 2011, NYPD Commissioner Raymond Kelly directed the release of Operations Order No. 52, which mandates that "Department managers <u>can</u> and

<u>must</u> set performance goals" related to issuing summons, questioning suspicious individuals, and arresting criminals.

118.    Because arrests are rewarded, while making false arrests go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges; such perverse incentives become particularly destructive in the hands of undisciplined, unsupervised officers.

119.    As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

        a.  Violation of her constitutional rights under the Fourth Amendment to the United States Constitution;

        b.  Severe emotional trauma, distress, degradation, and suffering;

        c.  Loss of income and income potential.

## SECTION 1983 CLAIMS

## FIRST CLAIM

### Deprivation of Federal Civil Rights Under Section 1983

120.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

121.    All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

122.    All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth Amendment to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

123.    The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth Amendment of the United States Constitution.

124.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## SECOND CLAIM

### False Arrest Under Section 1983

125.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

126.    By the actions described above, the individual defendants deprived Plaintiff of her federal civil rights, including her Fourth Amendment right to be secure in her person against unreasonable searches and seizures, specifically her right to be free of false arrest.

127.    As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

128.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## THIRD CLAIM

### Malicious Prosecution Under Section 1983

129.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

130.    By the actions described, the individual defendants deprived Plaintiff of her Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically her right to be free from malicious prosecution.

131.     Without probable cause, the individual defendants directly and actively initiated a criminal proceeding against Plaintiff.  In doing so, the individual defendants acted with actual malice, with reckless disregard for Plaintiff's innocence, doing so not to bring an offender to justice but to degrade Plaintiff.

132.     As a result of the malicious prosecution, Plaintiff was ordered, under threat of warrant and arrest, to return to court, and Plaintiff had an order of protection issued against her.

133.     The criminal proceeding terminated in Plaintiff's favor when all charges against her were dismissed.

134.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

**FOURTH CLAIM**

**Failure to Intervene Under Section 1983**

135.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

136.     Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by other law enforcement officers.

137.     The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of her constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

138.     As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

**FIFTH CLAIM**

**Excessive Force Under Section 1983**

139.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

140.    By the actions described, the individual defendants deprived Plaintiff of her Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically her right to be free from excessive and unreasonable force.

141.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

**Municipal Liability Under Section 1983**

142.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

143.    By the actions described, the Defendant City deprived Plaintiff of her Fourth Amendment right to be free of false arrest, malicious prosecution, and excessive force through its policy and custom of having flaccid supervision and weak disciplinary measures for NYPD officers who have histories of gross misconduct.

144.    By continuing to allow the individual defendants – and other potentially malicious, dishonest, rogue officers – the power to, among other things, carry a gun, make arrests, and initiate criminal charges against New Yorkers, the Defendant City has exhibited deliberate indifference to the safety, well-being, and rights of New Yorkers.

145.    By tolerating weak and ineffectual means of supervising, regulating, sanctioning, disciplining, and monitoring malicious and mendacious officers, Defendant City has intentionally disregarded the constitutional rights of New Yorkers.

146.     As a direct and proximate result of the acts of Defendant City, Plaintiff

sustained the damages and injuries hereinbefore alleged .


## PENDENT STATE CLAIMS

### FIRST CLAIM

**False Imprisonment under N.Y. State Law**

147.     Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

148.     The individual defendants intentionally arrested and detained Plaintiff without

probable cause, without a warrant, and without privilege or consent.

149.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

### SECOND CLAIM

**Malicious Prosecution Under N.Y. State Law**

150.     Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

151.     As detailed above, the individual defendants intentionally and with actual

malice initiated a felony prosecution against Plaintiff without probable cause.

152.     The prosecution terminated in Plaintiff's favor when the D.A. dismissed all

charges against her.

153.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .


### THIRD CLAIM

**Unreasonable Search and Seizure Under New York State Constitution Art. I § 12**

154.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

155.    Article 1, Section 12, of the New York State Constitution declares the right to be free from unreasonable searches and seizures.

156.    Without probable cause and without Plaintiff's consent, the individual defendants arrested Plaintiff, searched her person, took her property, confined her, and initiated false charges against her.

157.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### Battery Under N.Y. State Law

158.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

159.    As detailed above, the individual defendants intentionally touched Plaintiff in an offensive and harmful manner, and they intentionally subjected her to offensive and harmful contact.

160.    As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Negligent Hiring/Training/Retention of Employment Services Under N.Y. State Law (Against Defendant City of New York)

161.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

162.     Defendant City owed a duty of care to Plaintiff to prevent the false arrest, malicious prosecution, and mental and emotional abuse sustained by Plaintiff.

163.     Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

164.     Defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants could potentially cause harm.

165.     Defendant City's negligence in hiring, screening, training, disciplining and retaining the individual defendants proximately caused Plaintiff's injuries.

166.     As a result of its negligent conduct, Defendant City has directly and proximately caused the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

### Respondeat Superior Under N.Y. State Law

167.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

168.     Defendant City is the employer of the individual defendants.

169.     Under the doctrine of *respondeat superior*, the Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment – in this case, the false imprisonment, malicious prosecution, and unreasonable search and seizure committed by the individual defendants against Plaintiff.

170.     As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.   An order awarding compensatory damages for Plaintiff Courtney David in an amount to be determined at trial;

b.   An order awarding punitive damages in an amount to be determined at trial;

c.   A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs and disbursements; and

d.   Such other and further relief as this Court may deem appropriate.

DATED:       June 10, 2013               _____s/_____
             New York, New York          CYRUS JOUBIN, ESQ.
                                          317 Lenox Avenue, 10th Fl.
                                          New York, NY 10027
                                          (703) 851-2467
                                          joubinlaw@gmail.com
                                          Attorney for Courtney David